IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Inither Summers, | ) | C/A No.: 1:13-2546-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On March 13, 2009, Plaintiff filed an application for DIB in which she alleged her disability began on April 1, 2007. Tr. at 61. Her application was denied initially and upon reconsideration. Tr. at 66–67, 81. On September 20, 2011, Plaintiff had a hearing

before Administrative Law Judge ("ALJ") Thomas G. Henderson.  Tr. at 35–60 (Hr'g Tr.).  The ALJ issued an unfavorable decision on October 7, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–26.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–5.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 18, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 58 years old at the time of the hearing.  Tr. at 61.  She completed high school.  Tr. at 282.  She worked as a sewing machine operator, a cleaner, a hand packer, and a cafeteria attendant.[1]  Tr. at 51.  She alleges she has been unable to work since April 1, 2007.  Tr. at 61.

2.    Medical History

On September 28, 2007, Plaintiff presented to Doctors Care with complaints of right ankle swelling and pain and left hip pain when ambulating.  Tr. at 449.

Plaintiff presented to Doctors Care on May 4, 2008, regarding increased left hip pain.  Tr. at 432.  Plaintiff was referred to an orthopedist.  *Id.*

On May 22, 2008, Plaintiff presented to Richard Zimlich, M.D., with complaint of left hip pain.  Tr. at 332.  Dr. Zimlich observed that Plaintiff had marked discomfort to

---

[1] Plaintiff disputes the ALJ's conclusion that her work as a cafeteria attendant was past relevant work.

2

hip flexion and internal rotation; limited internal and external rotation; and limited hip flexion.  *Id.*  X-rays revealed complete loss of Plaintiff's left hip joint space with marked sclerosis and subchondral cyst formation on both the acetabular and femoral heads.  Tr. at 331–32.  Dr. Zimlich recommended total hip arthroplasty.  Tr. at 331.

On June 9, 2008, Michael Ragan, PA-C, completed a physician's statement in which he indicated that Plaintiff had "disabling arthritis" and that her disability was permanent.  Tr. at 427.

Plaintiff was admitted to Trident Health System from June 23–26, 2008, where Dr. Zimlich performed total left hip arthroplasty.  Tr. at 312.

Plaintiff presented to Dorchester Community Mental Health Center on July 28, 2008, to reestablish treatment.  Tr. at 455–64.  Her affect was flat and her mood was anxious, depressed, angry, and hopeless.  Tr. at 462.  Her thought process was disorganized at times and she had some excessive thoughts.  Tr. at 463.  Plaintiff's recent memory was poor and she was unable to do simple math.  *Id.*  She reported insomnia, decreased appetite/eating patterns, and both increased and decreased energy levels at times.  *Id.*

On August 7, 2008, Dr. Zimlich indicated that Plaintiff was doing well and that she was full weight bearing without any difficulty.  Tr. at 330.

On September 9, 2008, Plaintiff followed up with Dr. Zimlich, who noted that her left hip was doing well; that she should continue activity as tolerated; and that she should follow up on a yearly basis.  Tr. at 329.

On October 22, 2008, Plaintiff presented to Trident Health System with complaints of depression and anxiety.  Tr. at 317.

Plaintiff presented to Dr. Zimlich on January 8, 2009, complaining of lateral discomfort about the hip.  Tr. at 329.  Dr. Zimlich noted tenderness over the greater trochanter, but no erythema, no swelling, and good strength in abduction and forward flexion.  *Id.*

Plaintiff visited psychiatrist Kimberly Bowers, M.D., on March 3, 2009, and indicated that she was experiencing difficulty sleeping, racing thoughts, and irritability.  Tr. at 477.  Dr. Bowers noted that Plaintiff was exhibiting some manic symptoms, and she assessed a GAF score[2] of 51. Tr. at 478.  Dr. Bowers prescribed Risperdal.  *Id.*

On March 13, 2009, Plaintiff presented to the emergency room at Summerville Medical Center after having sustained a fall.  Tr. at 548.  She complained of mild right hip pain on weight bearing.  *Id.*  No abnormalities were noted.  *Id.*

Plaintiff presented to Doctors Care on March 31, 2009, for low back pain and hypothyroidism.  Tr. at 383.  She indicated that she fell in the grocery store on March 13, 2009, and that her left hip pain had increased.  *Id.*

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning.  The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning.  If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two.  Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

On April 28, 2009, Plaintiff visited Doctors Care to follow up on hypothyroidism and with complaint of left hip pain.  Tr. at 379.  Plaintiff was instructed to follow up with her orthopedist regarding the left hip.  *Id.*

On May 5, 2009, Plaintiff reported to Dr. Bowers that was taking Risperdal inconsistently because it caused daytime drowsiness.  Tr. at 480.  Dr. Bowers assessed a GAF score of 55 and noted that Plaintiff had limited insight into her illness.  Tr. at 480–81.

Plaintiff presented to the emergency room at Summerville Medical Center on May 6, 2009, complaining of depression.  Tr. at 543.

Plaintiff presented to the emergency room at Summerville Medical Center on May 13, 2009, complaining of anxiety-related symptoms.  Tr. at 531.

Plaintiff followed up with Dr. Bowers on May 27, 2009, regarding recent panic attacks.  Tr. at 482.  Plaintiff reported that Geodon made her sleepy.  *Id.*  Dr. Bowers prescribed Klonopin and Invega and assessed a GAF score of 55.  Tr. at 483.

Plaintiff presented to Doctors Care on July 8, 2009, with complaints of low potassium, high cholesterol, and muscle spasms in her legs.  Tr. at 376.  She was instructed to take over-the-counter fish oil and was prescribed Flexeril for muscle spasms.  *Id.*

Plaintiff presented to Doctors Care on August 17, 2009, with complaint of left knee pain.  Tr. at 375.

On August 25, 2009, Plaintiff followed up with Dr. Zimlich regarding left hip pain with prolonged activity and standing.  Tr. at 328.  Dr. Zimlich noted tenderness over

Plaintiff's greater trochanter, but no tenderness to ranging of the hip and good range of motion. *Id.* He diagnosed trochanteric bursitis. *Id.* Dr. Zimlich issued permanent restrictions limiting Plaintiff to occasional climbing; alternating positions; and lifting no greater than 16–35 pounds. Tr. at 315.

On September 12, 2009, Plaintiff presented to the emergency room at Summerville Medical Center complaining of anxiety. Tr. at 524.

Plaintiff presented to Doctors Care on September 13, 2009, complaining of panic attack. Tr. at 373. Plaintiff was prescribed Xanax and instructed to follow up with a psychiatrist. *Id.*

Plaintiff followed up with Dr. Bowers regarding panic attacks on September 21, 2009. Tr. at 484. Plaintiff indicated that she had stopped taking Invega. *Id.* Plaintiff indicated that she was demonstrating rapid speech at work and that she was having difficulty paying attention. *Id.* Plaintiff also reported worry, tearfulness, anxiety, and sleep disturbance. *Id.* Dr. Bowers prescribed Seroquel and assessed a GAF score of 55. Tr. at 485.

Plaintiff presented to the emergency room at Summerville Medical Center on September 30, 2009, with complaints of anxiety and left hip pain with difficulty walking. Tr. at 518.

Plaintiff was hospitalized for stabilization at Palmetto Lowcountry Behavioral Health September 30 to October 3, 2009, following the death of her brother-in-law. Tr. at 349–50. Plaintiff's psychiatric diagnoses included bipolar affective disorder, mixed

and anxiety disorder, not otherwise specified.  Tr. at 349.  Steven Lopez, M.D., assessed a GAF score of 55 upon discharge.  Tr. at 350.

On November 28, 2009, Plaintiff presented to Doctors Care for anxiety and hypothyroidism.  Tr. at 368.

Plaintiff followed up with Dr. Bowers on November 30, 2009.  Tr. at 486.  She reported a recent panic attack after running out of Klonopin.  *Id.*  Plaintiff denied tearfulness or depressed mood and indicated that her racing thoughts were reduced.  *Id.*  Dr. Bowers assessed a GAF score of 57.  Tr. at 487.

On December 5, 2009, Plaintiff presented to the emergency room at Summerville Medical Center after having injured her right knee in an assault.  Tr. at 488.  A right knee x-ray indicated no fracture and normal alignment.  Tr. at 514.  Plaintiff was diagnosed with a right knee sprain.  *Id.*

Plaintiff returned to Dr. Zimlich on December 9, 2009, regarding right knee pain.  Tr. at 552.  X-rays revealed no fracture or significant effusion.  Tr. at 551.  Dr. Zimlich injected her knee with Depo-Medrol and Lidocaine to reduce her pain.  *Id.*

Plaintiff presented to Dr. Zimlich on January 5, 2010, to review her MRI report.  Tr. at 551.  She reported some instability when arising from a chair and when twisting.  *Id.*  She also reported some discomfort medially.  *Id.*  Plaintiff's MRI indicated a tear of the anterior cruciate ligament ("ACL") along with a strain of the medial collateral ligament ("MCL").  Tr. at 550.  Dr. Zimlich recommended bracing and a rehabilitation program.  *Id.*

Plaintiff participated in physical therapy from January 12, 2010, through February 14, 2010, and she progressed well.  Tr. at 585–93.

On January 26, 2010, state agency consultant Michael Neboschick, Ph.D., completed a psychiatric review technique in which he considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders.  Tr. at 557–69.  Dr. Neboschick indicated that Plaintiff's mental impairments imposed mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Tr. at 567.  He completed a mental residual functional capacity assessment in which he found that Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting.  Tr. at 571–72.  Dr. Neboschick also indicated as follows:

> The cl is able to understand and remember simple instructions.  Sustain attention for simple, structured tasks for periods of 2 hour segments.  Adapt to changes if they are gradually introduced and infrequent.  Make simple work-related decisions.  Maintain appropriate appearance and hygiene.  Recognize and appropriately respond to hazards.  Work in the presence of others.  Accept supervision.  The cl would work best in settings that do not require extensive direct, on-going interaction w[ith] the public.

Tr. at 573.

Tom Brown, M.D., completed a physical residual functional capacity assessment on February 8, 2010, in which he indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull unlimited; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling; never climbing ladders/ropes/scaffolds; and avoid even moderate exposure to hazards.  Tr. at 575–82.

On February 16, 2010, Dr. Zimlich indicated that Plaintiff was doing much better and had been able to return to most of her normal activities with the brace.  Tr. at 550.

Plaintiff met with Rebecca Hackett at Dorchester Community Mental Health on March 15, 2010, for individual therapy.  Tr. at 736.  Plaintiff reported that her sleep and mood had improved since she changed her working hours.  Tr. at 736.  She indicated that her panic attacks had decreased to approximately once a month.  *Id.*

Plaintiff returned to individual therapy with Ms. Hackett on March 24, 2010.  Tr. at 739.  She reported an increase in panic attacks following recent stressors.  *Id.*  Plaintiff followed up with Ms. Hackett on March 29, 2010, April 6, 2010, and April 12, 2010.  Tr. at 740–42

On April 14, 2010, Dr. Zimlich noted that Plaintiff's knee was doing better and that, while she had some swelling and discomfort, she had no episodes of instability.  Tr. at 594.

Plaintiff returned to Dorchester County Mental Health on May 7, 2010, and was treated by Broxann B. Spencer, M.D.  Tr. at 641–42.  She reported receiving medications from multiple physicians, and Dr. Spencer informed her that she would no longer be prescribed Klonopin through the mental health center.  Tr. at 642.  Dr. Spencer also noted that Plaintiff had frequently discontinued medications prescribed by her psychiatrists without discussing it with the psychiatrists.  *Id.*  She indicated that Plaintiff should continue with counseling.  *Id.*  Plaintiff also met with Ms. Hackett.  Tr. at 745.

Plaintiff followed up at Dorchester Medical Associates on May 24, 2010.  Tr. at 624.  Plaintiff reported that she was having difficulty sleeping, but that Dorchester County Mental Health would not prescribe her medications since her primary care physician was prescribing Klonopin.  *Id.*  Plaintiff's medications were refilled and Seroquel was prescribed.  *Id.*

Plaintiff met with Ms. Hackett on June 8, 2010, to discuss her functioning and coping mechanisms.  Tr. at 755.

On June 24, 2010, Plaintiff visited Dorchester Medical Associates to obtain medication refills.  Tr. at 623.  She reported anxiety and mood swings.  *Id.*  Tegretol was prescribed and Klonopin was continued.  *Id.*

On July 26, 2010, Plaintiff reported to Ms. Hackett that she was working from 8:00 to 1:00 on five days per week.  Tr. at 762.  She indicated that she was experiencing some frustration with her job duties and that she was angry with her boss and a coworker about a change in responsibilities.  *Id.*

10

Plaintiff reported increased left hip pain to Dr. Zimlich on August 4, 2010. Tr. at 643. Physical examination was normal except for some discomfort to hip flexion and internal and external rotation, which was localized to the greater trochanter. *Id.* Dr. Zimlich noted slight heterotopic bone at the tip of the greater trochanter and indicated an impression of trochanteric bursitis. *Id.* He indicated that Plaintiff should continue anti-inflammatories and modified activity and return on an as-need basis. *Id.*

On August 13, 2010, Lisa Varner, Ph.D., completed a psychiatric review technique in which she considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 645–57. Dr. Varner indicated that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 655.

On August 27, 2010, Dr. Zimlich indicated the following restrictions: never bending or stooping; lifting restricted to 16 to 35 pounds bilaterally; and patient must wear brace. Tr. at 644.

An x-ray of Plaintiff's left hip on August 31, 2011, was unremarkable. Tr. at 659. X-rays of Plaintiff's right knee demonstrated mild osteoarthritis involving the medial compartment. Tr. at 660.

On September 22, 2010, Plaintiff attended a consultative orthopedic examination with David W. Robinson, M.D., after being referred by the South Carolina Vocational Rehabilitation Department. Tr. at 661. Plaintiff reported to Dr. Robinson that she was disabled due to mental health issues, right and left knee pain, and left hip pain. *Id.* Dr.

Robinson noted that Plaintiff was walking with a brace on her right knee, which altered her gait somewhat, but that she managed to walk with reasonable balance and pace. Tr. at 663. Plaintiff had reasonable range of motion in her neck and back without significant pain or limitation. Tr. at 664. Plaintiff had reduced range of motion in her cervical spine, but normal range of motion in her lumbar spine. Tr. at 667. She had reduced range of motion in her bilateral hips, but no tenderness or swelling. Tr. at 664, 667. Plaintiff had reduced flexion in her bilateral knees. Tr. at 667. She had mild joint effusion in her right knee. Tr. at 664. Her knee strength was 4+ to 5/5 with splinting. *Id.* She had slight joint effusion, but fully intact strength in her left knee. *Id.* Dr. Robinson indicated that repetitive squatting or climbing may not be appropriate for Plaintiff with her history of hip replacement. Tr. at 665. He indicated that Plaintiff would likely have some problems with her left knee with prolonged standing, walking, squatting, or climbing. *Id.* He indicated that Plaintiff was capable of short-distance walking, but that she would have some limitations in long distance standing, walking, and climbing and on uneven surfaces. Tr. at 665–66. Dr. Robinson suggested that Plaintiff would have no problems with light to occasional moderate lifting; gross and fine manipulation; overhead reaching; and understanding, remembering, and carrying out instructions. Tr. at 666. However, he noted that Plaintiff would have problems with climbing on ladders and machinery; driving or traveling for work purposes; and responding to supervision, coworkers, and work pressures. *Id.*

On September 29, 2010, Plaintiff reported to Ms. Hackett that she had an altercation at work.  Tr. at 768.  Ms. Hackett discussed with Plaintiff how she could have better handled the situation.  Tr. at 768.

On November 24, 2010, state agency consultant Jean Smolka, M.D., completed a physical residual functional capacity assessment in which she indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull limited to frequent in bilateral lower extremities; never climbing ladders/ropes/scaffolds; occasionally kneeling, crouching, and crawling; frequently climbing ramps/stairs, balancing, and stooping; and avoid even moderate exposure to hazards.  Tr. at 692–99.

On December 9, 2010, Plaintiff indicated to Ms. Hackett that she was being more assertive with her daughter and coping better at work.  Tr. at 776.

On December 21, 2010, Plaintiff reported to Ms. Hackett that her panic attacks were occurring less frequently.  Tr. at 777.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on September 20, 2011, Plaintiff testified that she was working at Goodwill, where she wiped tables, served food, and washed dishes.  Tr. at 36–37. Plaintiff indicated that she had worked for Goodwill for three years and that she worked

13

for 15 hours per week.  Tr. at 37.  Plaintiff testified that she had worked for Goodwill on a full time basis in 2009, but that they had reduced her hours so that she would not lose her eligibility for Supplemental Security Income ("SSI").  Tr. at 38.  Plaintiff indicated that her SSI benefits had been terminated two years earlier because of her part-time work, but that she had recently received a SSI check because she had been suspended from work.  Tr. at 38–39.  Plaintiff indicated that she had been referred to anger management classes and suspended from work for a month and five days because of problems following directions and conflict with her supervisor.  Tr. at 39–40.

Plaintiff testified that she spent most days lying in bed because she was depressed. Tr. at 42.  Plaintiff testified that she received biweekly treatment at Dorchester County Mental Health, but that they would no longer prescribe medication for her because they realized she was obtaining medications from multiple providers.  *Id.*  Plaintiff indicated that she had panic attacks and difficulty sleeping.  Tr. at 43–44.

Plaintiff testified that she was prescribed Seroquel for sleep, Percocet for pain, and Klonopin for anxiety and panic attacks.  Tr. at 44.  Plaintiff indicated that her medication made her sleepy and limited her ability to drive.  Tr. at 45.

Plaintiff testified that hip pain hindered her abilities to lift, bend, and stand.  Tr. at 45–46.  Plaintiff also indicated that back pain limited her ability to lift.  Tr. 46.

Plaintiff clarified that she worked for five hours per day on three days per week at Goodwill.  Tr. at 47.  Plaintiff indicated that she spent the entire period on her feet, except for when she went to the bathroom.  *Id.*  Plaintiff testified that she had to be at

work at 4:00 a.m. when she worked full time and that she had problems interacting with others because she was not getting adequate sleep.  Tr. at 48.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Kristan Cicero reviewed the record and testified at the hearing.  Tr. at 48–54.  The VE categorized Plaintiff's past relevant work ("PRW") as a sewing machine operator as light and unskilled with a SVP of two; as a cleaner as medium and unskilled with a SVP of two; as a hand packer as medium as generally performed and unskilled with a SVP of two, but noted that it was sedentary as Plaintiff performed it; and as a cafeteria attendant as light and unskilled with a SVP of two.  Tr. at 51.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but would be limited to occasional postural activities with no climbing; would need to avoid work hazards; and would be limited to simple, routine, repetitive tasks.  Tr. at 51–52.  The VE testified that the hypothetical individual would be able to perform Plaintiff's past work as a cafeteria attendant and a hand packer.  Tr. at 52.  The ALJ asked the VE whether those jobs could be performed if the individual were limited to no ongoing interaction with the general public.  *Id.*  The VE testified that the additional restriction would eliminate the cafeteria attendant position.  *Id.*  The ALJ then asked the VE to assume that the individual would have difficulties with concentration one or two hours out of the workday and asked what effect that would have on the jobs cited.  *Id.*  The VE indicated that it would eliminate all the jobs and that the individual would not be able to maintain employment.  *Id.*

c.    Witness Testimony

Jeannette Harris testified as a witness at the hearing.  Tr. at 55–59.  Ms. Harris testified that she was one of Plaintiff's best friends and that she saw her multiple times each week.  Tr. at 56.  Ms. Harris indicated that Plaintiff was sad most of the time and that she had problems completing tasks.  *Id.*  She indicated that Plaintiff had problems being around others because she had outbursts.  Tr. at 58.  Ms. Harris indicated that Plaintiff sometimes called her and was upset, but could not explain why she was upset.  *Id.*  She testified that Plaintiff had problems focusing and that she was afraid to ride with Plaintiff.  *Id.*  She indicated that she had known Plaintiff for approximately nine years.  *Id.*  She testified that she took Plaintiff with her to garage sales, out to eat, and to her home for meals and to plant flowers.  Tr. at 58–59.

2.    The ALJ's Findings

In his decision dated October 7, 2011, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.
2.    The claimant engaged in substantial gainful activity during the following periods:    01/01/2009 to 12/31/2009 (20 C.F.R. §§ 404.1520(b) and 404.1571 *et. seq.*).
3.    However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
4.    The claimant has the following severe impairments: status-post left hip replacement, right knee anterior cruciate ligament tear, and bipolar disorder (20 C.F.R. § 404.1520(c)).
5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

16

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

6.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she can only occasionally bend, stoop, balance, kneel, crouch, and crawl; can never climb; must avoid hazards; and is limited to simple, routine, and repetitive tasks.

7.  The claimant is capable of performing past relevant work as a cafeteria attendant. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

8.  The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2007, through the date of this decision (20 C.F.R. § 404.1520(f)).

Tr. at 20–26.

D.    Appeals Council Review

On January 11, 2013, the Appeals Council issued a notice indicating that it found no reason under its rules to review the ALJ's decision and that the ALJ's decision was the final decision of the Commissioner. Tr. at 7.

On July 18, 2013, the Appeals Council issued a notice in which it indicated that it was setting aside its action dated January 11, 2013, to consider additional information. Tr. at 1. This notice also stated that the Appeals Council found no reason under its rules to review the ALJ's decision; denied Plaintiff's request for review; and indicated that the ALJ's decision was the final decision of the Commissioner in Plaintiff's case. *Id.*

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ's RFC findings are neither supported by substantial evidence nor based on the appropriate legal framework; and

17

2)    The ALJ's step four finding does not rest on substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a

whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from

---

claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's PRW to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for

20

the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

> B.    Analysis

> 1.    RFC Findings

Plaintiff argues that the ALJ failed to properly consider her subjective complaints. [Entry #16 at 13]. Plaintiff also argues that the ALJ erroneously relied upon her attempts to perform part-time work to find that she was capable of performing work on a "regular and continuous basis." [Entry #16 at 14]. Plaintiff contends that the ALJ erred in failing to examine the basis for her 1991 disability finding. [Entry #16 at 14–15].

The Commissioner argues that the ALJ considered Plaintiff's subjective complaints, but found that her statements were not credible. [Entry #17 at 6]. The Commissioner argues that the ALJ permissibly drew a negative inference from the inconsistency between Plaintiff's subjective complaints and the available evidence. [Entry #17 at 8]. The Commissioner also argues that the governing law does not require the ALJ to expressly make a separate finding on the issue of the claimant's ability to do sustained activities on a regular and continuous basis. [Entry #17 at 10–11].

Prior to considering a claimant's subjective complaints, an ALJ must find that a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the

severity and persistence alleged.  *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which

includes the following: the objective medical evidence; the individual's activities of daily living; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

The ALJ found that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment."  Tr. at 23. The ALJ noted the following regarding Plaintiff's testimony:

> At the hearing, the claimant testified that [she] works 3 days a week for 5 hours per day.  Apparently, she was working full time but shortened her hours so that she could continue to receive supplemental security income. In terms of her activities of daily living, the claimant testified that she lies in bed in a depressed mood.  She has difficulty sleeping.  She reported that her hip pain affects her ability to lift objects.

Tr. at 22–23.

The undersigned recommends a finding that the ALJ did not adequately consider Plaintiff's credibility in accordance with SSR 96-7p.  While the ALJ cited the objective evidence, Plaintiff's statements to her physicians, the medical opinions, and some of her activities of daily living to support his decision, the ALJ neglected to address several of

Plaintiff's statements that suggested that her symptoms limited her ability to engage in work activity on a full-time basis. *See* Tr. at 23–25. The ALJ determined that Plaintiff stopped working full time based only on her desire to continue to receive SSI, but he did not address evidence in the record that suggested Plaintiff was unable to continue to perform full time work because of her impairments. *See* Tr. at 22. While the ALJ cited some of Plaintiff's testimony, he failed to address her indications that she had problems following directions and interacting with coworkers that were supported by records from Dorchester County Mental Health. *See* Tr. at 39–40, 484, 736, 762, 768, 776. The ALJ also neglected to consider Plaintiff's testimony and her complaints to her physicians that her medication caused drowsiness and interfered with her ability to function during the day. *See* Tr. at 45, 480, 482. SSR 96-7p requires that the ALJ consider the factors set forth above. Because the ALJ failed to consider the side effects of Plaintiff's medications and work-related factors that aggravated Plaintiff's symptoms of bipolar disorder, the undersigned recommends a finding that the ALJ erred.

The undersigned declines to address whether the ALJ was required to examine the basis for the 1991 decision that Plaintiff was disabled. The undersigned acknowledges that the record is unclear as to what happened with Plaintiff's appeal of the cessation determination in that claim[5] and that the notice Plaintiff submitted indicating that she was

---

[5] The record reflects that Plaintiff became entitled to DIB in June 1991 based on affective/mood disorders and schizophrenia, paranoid, and other functional psychotic disorders. Tr. at 145. However, the record also reflects that a subsequent determination was made that Plaintiff's disability ceased in December 1996 because Plaintiff engaged in SGA. *Id.* Plaintiff reapplied for benefits on April 9, 2002, and a final medical allowance was issued. *Id.* A subsequent decision was made to cease benefits in 2009,

receiving SSI benefits as recently as August 9, 2013, only further muddies the waters. *See* Entry #16-1. To the extent that there are conflicting decisions regarding Plaintiff's eligibility for DIB and/or SSI, the undersigned recommends that the Commissioner resolve these issues on remand.

### 2. Step Four Determination

Plaintiff argues that the ALJ ignored evidence that Plaintiff was unable to mentally or physically perform her job to the satisfaction of her supervisors and that she worked in a "sheltered environment." [Entry #16 at 15].

The Commissioner argues that the only evidence that supports the notion that Plaintiff was unable to perform her PRW was her own testimony, which the ALJ found to be lacking in credibility. [Entry #17 at 12].

PRW is work that the claimant performed within the prior 15-year period, that lasted long enough for him or her to learn how to do it, and that was SGA. 20 C.F.R. § 404.1565(a).

SGA involves doing significant physical and mental activities for pay or profit. 20 C.F.R. § 404.1572. If work is performed under special conditions, such as in a sheltered workshop or as a patient in a hospital, "we may find that it does not show that you have

---

but the record does not contain a copy of that decision. It only contains a copy of Plaintiff's request for reconsideration dated July 29, 2009. Tr. at 65. On April 17, 2010, Plaintiff filed a statement indicating that she had been advised of her rights and elected to continue SSI benefits and Medicaid coverage "pending the outcome of the appeal regarding the decision" that her disability had ceased. Tr. at 251–52. On July 11, 2010, an application for continuing eligibility for SSI payments was filed on Plaintiff's behalf by Family Services, Inc. Tr. at 71–80.

the ability to do substantial gainful activity." 20 C.F.R. § 404.1573(c). Examples of special conditions that may relate to employment include situations in which a claimant (1) requires and receives special assistance from other employees in performing work; (2) is allowed to work irregular hours or take frequent rest periods; (3) is provided special equipment or assigned work especially suited to his or her impairment; (4) is able to work because of specially arranged circumstances; (5) is permitted to work at a lower standard of productivity or efficiency than other employees; or (6) is given an opportunity to work despite his or her impairment because of a family relationship, past association with the employer, or the employer's concern for his or her welfare. *Id.*

When work is performed in a sheltered or special environment, the claimant may or may not earn the amount paid. 20 C.F.R. § 404.1574(a)(3). However, there is no presumption that a claimant is not earning all that he or she is being paid merely because the workshop or facility is operating at a loss or receiving charitable contributions or government aid. *Id.* The determination of whether work activity counts as SGA is generally based on a review of earnings guidelines. See 20 C.F.R. § 404.1574(b). However, to determine if work performed under special conditions is SGA, the amount specified in the earnings guidelines should be reduced by the value of any subsidized earnings and the reasonable cost of any impairment-related work expenses. 20 C.F.R. § 404.1574(b).

In *Miller v. Astrue*, No. 0:10-1548-TMC-PJG, 2011 WL 5526196 (D.S.C. Oct. 24, 2011), *adopted by* 2011 WL 5526027 (D.S.C. Nov. 14, 2011), this court found that remand was appropriate where the plaintiff presented evidence to suggest that she was

working under special conditions and the ALJ's opinion found that the plaintiff engaged in SGA, but did not indicate that she considered whether the plaintiff was working under special conditions.

The record contains evidence to suggest that Plaintiff's work as a cafeteria attendant at Goodwill was sheltered work.[6]  Plaintiff indicated in a disability report that she had received support services to help her go to work through Goodwill.  Tr. at 199. Plaintiff wrote a letter dated March 22, 2010, in which she indicated that she worked with other disabled individuals at Goodwill, that she could not work in a regular job, and that she missed work frequently.  Tr. at 232–37.  Plaintiff testified that she had recently been suspended from her job for one month and sent to anger management classes because she was having problems on her job.  Tr. at 39–40.  Plaintiff also testified that she could not obtain other employment because she could not perform simple math, understand directions, or maintain focus.  Tr. at 41.  On November 18, 2011, Plaintiff wrote a letter to the Appeals Council in which she indicated that she was unable to perform some of the duties expected in her job at Goodwill and that she had additional help in performing her job.  *See* Tr. at 14.

---

[6] The record contains a work activity report in which "Goodwill Industries" was indicated to be Plaintiff's employer and a box beside "no" was checked in response to the question "Do you get special help on-the-job or extra pay in any of the jobs that you told us about in item 3?"  Tr. at 186–91.  Although this form has a spot for "signature of claimant," it was not signed by Plaintiff or her representative and was instead attested to by Keith Austin, who is indicated to be the SSA interviewer/reviewer.  See Tr. at 191, 193. Because Plaintiff did not sign this form, the undersigned is not inclined to penalize her for its content.

The undersigned recommends a finding that the ALJ erred in determining that Plaintiff was able to perform PRW as a cafeteria attendant. Plaintiff presented evidence to suggest that she was working in a sheltered or special environment. The record reflects that Plaintiff alleged she required and received special assistance from other employees, was allowed to work irregular hours, engaged in special work suited to her impairment, had a lower than normal standard of efficiency, and worked under specially arranged circumstances. These are the elements that define work in a sheltered or special environment under 20 C.F.R. § 404.1573(c). The ALJ neglected to address this evidence in considering Plaintiff's work at Goodwill. In determining that Plaintiff engaged in SGA while working at Goodwill in 2009, the ALJ only considered the amount of Plaintiff's earnings and ignored the provisions in 20 C.F.R. § 404.1574(b), which required that he consider whether Plaintiff's wages were being subsidized. *See* Tr. at 20. For Plaintiff's job as a cafeteria attendant to be considered PRW, it also had to be SGA. *See* 20 C.F.R. § 404.1565(a). Based on this court's decision in *Miller*, the undersigned recommends that the case be remanded.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

September 25, 2014                                    Shiva V. Hodges
Columbia, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).